UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MATTHEW L. JACKSON, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 08 C 3339 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| JERNBERG INDUSTRIES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM OPINION & ORDER**

Plaintiff Matthew Jackson brought this action pursuant to the Family and Medical Leave Act, 29 U.S.C. §§ 2601-2654 (2006) (the "FMLA") against his former employer, defendant Jernberg Industries, Inc. Jackson has produced evidence showing that Jernberg required him to provide a doctor's note for each FMLA absence that he took, that he did not do so, and that as a result Jernberg disciplined and terminated him. Jernberg largely agrees with Jackson's material facts, but disagrees as to the legal conclusion to be drawn from those facts. Jernberg maintains that it simply enforced its attendance policy which, according to Jernberg, was a reasonable safeguard against employee abuse of FMLA leave, while Jackson asserts that Jernberg's enforcement of its policy violated the FMLA by interfering with his use of FMLA leave.

Presently before the court are the parties' cross-motions for summary judgment. For the reasons stated herein, the court denies Jernberg's motion for summary judgment, and grants Jackson's motion for summary judgment.[1]

---

[1] Jernberg has separately moved to strike certain of Jackson's statements of fact on various grounds. (*See generally* Jern. Mot.) Consistent with Jernberg's cited cases, the court will consider these objections as such and not in the context of a separate motion to strike. Therefore, Jernberg's motion to strike is denied.

# I. UNDISPUTED FACTS

The material facts of this case are largely undisputed. (*See* Jernberg's Memorandum in Support of Motion for Summary Judgment ("Def.'s Mem.") 1; *see also* Jackson's Memorandum of Law in Support of His Motion for Summary Judgment ("Pl.'s Mem.") 1.) The facts are taken from the parties' statements of uncontested facts, the responses thereto, and the evidence in support those facts and responses, and are undisputed unless otherwise stated.

## A. Background

Jernberg manufactures forged and machined components for the automotive industry. Jernberg employs more than fifty employees within seventy-five miles of Jernberg's work site in Chicago, and specifically employed Jackson full-time from September 30, 2002 until June 29, 2006. Jackson worked in the Final Processing division of Jernberg, at times performing manual labor that was physically demanding. (Pl.'s Ex. B ¶ 7.) The parties agree that Jackson was at all relevant times an "eligible employee" of Jernberg within the meaning of the FMLA. (*Id.* ¶ 4.)

Jernberg's attendance policy required not just verbal notification of a medically necessary absence, but also a written doctor's note. (*See* Def.'s Resp. to Pl.'s Stmt. Add'l Facts ¶ 4.) Jernberg disciplined then terminated Jackson based on absences that Jackson verbally told Jernberg were due to his FMLA-certified wrist condition, but for which he failed to provide individualized documentation. (*See id.* ¶¶ 3, 29.) After taking the extended leave discussed within, Jackson otherwise continued to comply with Jernberg's attendance policy, with a few minor exceptions. (*See id.* ¶ 30; *see also* Def.'s Ex. 16.) Jackson had sufficient FMLA leave remaining during the period at issue so that, had

Jernberg not required documentary support for medical absences, Jackson likely would not have been subject to discipline and termination for missing the days he did. (*See* Def.'s Resp. to Pl.'s Stmt. Add'l Facts ¶¶ 31, 33.)

### B. Jernberg's Attendance Policy

Jernberg has an Employee Handbook, which Jackson received on his first day on the job. (Def.'s Ex. 8.) The Employee Handbook contains an attendance policy which states:

> An absence is defined as any scheduled work day, including weekends, when the employee does not report to work. No distinction is made between excused and unexcused absences. However, if an employee is off for medical reasons, a Doctor's excuse is required after two (2) consecutive days. If no excuse is provided, each day will be considered a separate absence.

(Def.'s Ex. 3 D053.) If the employee produces a "Doctor's excuse"–a term left undefined by the Employee Handbook–Jernberg counts several consecutive days covered by that excuse as one "instance" of absence.

Under Jernberg's attendance policy, instances of absence–whether unexcused individual days or excused extended periods of absence–are equal to points. Each "instance of absence" is equal to one point; tardy appearances are assessed .25 points, or .5 points if greater than one hour. (*Id.* D055.) Points trigger disciplinary action: an employee's accumulation of 5 points results in a written warning; 8 points in a second written warning; 12 points in a three-day suspension; and 14 points in termination. (*Id.* D057.)

However, not all instances of absence count toward these disciplinary thresholds:

> Exceptions are defined as . . . absences that satisfy the provisions of the Family Medical Leave [*sic*] or American with Disabilities Act. By definition under FMLA an employee may take up to 12 weeks off in a 12

> month period either consecutively or intermittently and this time off can not [*sic*] negatively affect the employee's attendance record.
>
> However, the employee is required to follow the procedure for FMLA and a medical certification must be on file for no points to apply.

(*Id.* D055; *see also id.* D020.) Jernberg grants FMLA leave, *inter alia*, when a "serious health condition of the employee . . . makes the employee unable to perform the employee's job." (Def.'s Ex. 3 D020.) A form that Jernberg employees complete to request FMLA leave requires that employees "understand and agree" that for "an intermittent leave, documentation must be presented with each absence for the absence to be applied against the FMLA status." (Def.'s Ex. 5 D268.) Finally, points are assessed for a period of twelve months, so that any absences more than one year old will not count toward an employee's current point total. (Def.'s Ex. 3 D058.)

### C. Jackson's Health Problems

From 2003 through his 2006 termination, Jackson suffered from weakness and pain in his left wrist and hand. He planned to have surgery on the wrist and hand and, on August 3, 2004, completed an Application for Family/Medical Leave of Absence for leave of 12 to 16 weeks, which Jernberg granted on September 1, 2004. (*See* Def.'s Ex. 13 D300-02.) Jackson underwent surgery, and was absent with FMLA leave from August 4, 2004 through October 24, 2004. (*See* Def.'s Ex. 16.) For this absence, Jackson was assessed no points. (*See* Def.'s Exs. 13, 16.)

Despite the surgery, Jackson continued to suffer from wrist and hand problems. On August 28, 2005, he again applied for intermittent FMLA leave, for a period of one year. (*See* Def.'s Ex. 17.) In completing the application, Jackson attested that he understood and agreed that for "an intermittent leave, documentation must be presented with each absence for the absence to be applied against the FMLA status." (*See id.*) Dr.

Roderick Birnie provided him with a Certification of Health Care Provider (the "Certification") stating that Jackson: was experiencing weakness and pain on that wrist; was permanently restricted from lifting over twenty pounds; would be off work for two weeks for surgery and post-operative therapy; would require extensive physical therapy; and was unable to perform work of any kind. (*See generally* Def.'s Ex. 18.) Dr. Birnie did not certify the specific dates when Jackson would need to be absent from work. Jernberg received this Certification on September 12, 2005, and approved Jackson's request for intermittent FMLA leave on September 29, 2005. (*See generally* Def.'s Ex. 17; *see also* Def.'s Resp. to Pl.'s Stmt. of Facts ¶ 16.)

Between August 29, 2005 and February 6, 2006, Jackson was absent for 88 days due to his FMLA-certified condition. (Pl.'s Resp. to Def.'s Stmt. of Facts ¶ 24.) Jackson gave notes from Dr. Birnie to Jernberg excusing all of Jackson's absences before the surgery. (*See* Def.'s Exs. 19, 20 & 21.) Jackson had his surgery on November 7, 2005, and was absent until February 6, 2006; the parties agree that these absences were pre-approved and FMLA-covered. (*See* Def.'s Resp. to Pl.'s Stmt. of Facts ¶ 21.) During this post-surgery period, Jackson provided verbal notice for each absence, *see id.* ¶¶ 22-23; *see also* Pl.'s Resp. to Def.'s Stmt. of Facts ¶ 33, but resisted providing documentation. On November 16, 2005, a Jernberg administrator informed Jackson that he needed to provide documentation that would support his post-surgery absence, pursuant to Jernberg's attendance policy. (*See* Def.'s Ex. 22.) Jackson disagreed, arguing that Dr. Birnie's October 13, 2005 note stated that Jackson might have to miss time post-surgery and that "he should not need to go to the doctor each and every time he is off for his wrist." (*Id.*) Also on November 16, 2005, the administrator sent a letter

5

reminding Jackson of the attendance policy, noting that Jackson had not submitted certain paperwork, and allowing Jackson until November 23 to provide the requisite documentation. (*See* Def.'s Ex. 23.)

Jackson relented, and provided two notes from Dr. Birnie explainint that all of Jackson's absences through February 2, 2006 should be excused. (*See* Def.'s Exs. 25 & 26.) After reevaluation on February 2, Jackson provided Jernberg with another doctor's note stating that Jackson could return on February 6, 2006, to "light duty" in which he could engage in "no lifting over 10 lbs. with left arm." (*See* Def.'s Ex. 27.)

### D. Jackson's Discipline and Termination

When Jackson returned to work on February 6, 2006 (*see id.* ¶ 34) he had four attendance points resulting from unexcused absences during the previous twelve months.[2] In the next five weeks, Jackson was absent four days: February 10, February 15, March 7, and March 8. (*See id.* ¶¶ 35, 36, 38.) For each day, Jackson verbally explained without doctor's note or other documentation that his absence was pursuant to his FMLA-certified wrist condition. (*See id.*) During this period, Jackson was also tardy on two days for non-wrist-related reasons. (*See id.* ¶ 37.) Jernberg assessed him one point for each day absent, and one-quarter point for each day tardy, bringing his total points to 8.5 for the period from March 8, 2005 to March 8, 2006. Because Jackson had cleared the first and second disciplinary thresholds, Jernberg sent him a written warning. (*See id.* ¶ 39.)

---

[2] Jackson received initial and secondary warnings before his February 2006 return from surgery. (*See* Pl.'s Resp. to Def.'s Stmt. of Facts ¶ 17.) Those warnings are irrelevant to the resolution of the instant motions except for the fact that four of the disciplinary points that triggered his earlier discipline remained unexpired at the time of Jackson's return.

6

Jackson was again absent from work six days between April 3 and April 10, and again verbally notified Jernberg that his absences were related to his FMLA-certified condition without providing a doctor's note. (*See* Pl.'s Resp. to Def.'s Stmt. of Facts ¶ 40.) These absences brought Jackson's total to 13.5 points.[3] (*See id.*) The Jernberg human resources administrator met with Jackson on April 12, 2006 and gave him until April 13 to provide documentary support for his absence, which Jackson never did. (*See id.* ¶¶ 42-43.) On April 13, Jernberg assessed Jackson a three-day suspension pursuant to its attendance policy. (*See id.*)

On May 2, 2006, Jernberg sent Jackson a letter noting that he had been absent since April 24, 2006, and granting him until May 8, 2006 to provide documentation regarding his absence. (*See id.* ¶ 49.) Jackson did so, providing a note that attributed his absence to chest pain. (*See id.* ¶ 50.) Jernberg counted these ten work days as one instance of absence pursuant to its attendance policy so that Jackson had 13.5 points.[4] (*See* Pl.'s Resp. to Def.'s Stmt. of Facts ¶ 50.)

Jackson was again absent for three days beginning May 10, 2006, but provided a doctor's note stating that Jackson had a "medical condition" and so should have his absences excused. (*See id.* ¶ 51.) Jernberg accordingly assigned no points against Jackson for those absences. (*See id.*) Jackson had a work-related absence on June 1, but then was absent on June 9 and June 22, 2006, absences that he verbally explained were

---

[3] One point assessed to Jackson for his March 16, 2005 absence expired on March 16, 2006, so that by the time of his April 2006 absences, the March 2005 absence no longer counted toward his point total.
[4] One point assessed to Jackson for his April 21, 2005 absence expired on April 21, 2005 and thereafter no longer counted toward his point total.

7

related to his FMLA-certified condition, but for which he provided no documentation.[5] (*See id.* ¶¶ 52-54.) Jackson was assessed a point for each day, bringing his total to 15.5 points, which exceeded the 14-point threshold necessary for termination. On June 29, 2006, Jernberg terminated Jackson. (*See id.* ¶ 57.)

## II. LEGAL STANDARD

Summary judgment is warranted where "the pleadings, the discovery, and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *Brengettcy v. Horton*, 423 F.3d 674, 680 (7th Cir. 2005). All facts, and any inferences to be drawn from them, must be viewed in the light most favorable to the non-moving party. *Wis. Cent., Ltd. v. Shannon*, 539 F.3d 751, 756 (7th Cir. 2008); *see also Bassiouni v. F.B.I.*, 436 F.3d 712, 721 (7th Cir. 2006) (same for cross-motions). Normal burdens of proof remain, however. If a plaintiff has failed to establish one of the elements of his case and there is no factual dispute regarding that element, then summary judgment will be entered in favor of the defendant. *See Beard v. Banks*, 548 U.S. 521, 529-30 (2006); *see also Johnson v. ExxonMobil Corp.*, 426 F.3d 887, 892 (7th Cir. 2005) ("Summary judgment for a defendant is appropriate when a plaintiff fails to make a sufficient showing to establish the existence of an element essential to [his] case on which she will bear the burden of proof at trial.") (quoting *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805-06 (1999) (citations and alterations omitted)).

---

[5] An issue not addressed by the parties is whether Jernberg's requirement that Jackson produce a doctor's note for these June absences and Jackson's absences on February 10 and 15 derived from its attendance policy (which appears to require a doctor's excuse only after two consecutive days of absence) or from some other requirement, perhaps reflected in Jackson's application for FMLA leave, that Jackson provide a doctor's note for each individual absence.

8

### III. ANALYSIS

**A. Inadmissible Evidence**

A preliminary issue concerns certain evidence presented by Jackson that Jernberg contends is inadmissible. "Admissibility is the threshold question because a court may consider only admissible evidence in assessing a motion for summary judgment." *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). First, Jackson offers two statements: one allegedly made to him by an unnamed representative of the United States Department of Labor, that Jernberg's doctor's-note policy was unlawful; and a second, Jackson's subsequent statement to Jernberg relaying the representative's previous statement. (*See* Affidavit of Matthew L. Jackson, Pl.'s Ex. 1, ¶¶ 21, 22.) Jackson seeks to introduce both statements by his own affidavit. Jackson acknowledges that these statements are inadmissible for the truth of the matters asserted (in the case of the first statement, the lawfulness of the policy, and in the second, the fact that the representative made the previous, first statement). Jackson instead argues that these statements are relevant to show that Jernberg's policy discouraged him from exercising his FMLA leave. Jackson has not demonstrated these statements' relevance to the determination of whether *Jernberg* discouraged him from exercising his right to FMLA leave, and the statements are therefore excluded from consideration here.

Next, Jackson attests that Dr. Birnie told him that he (Dr. Birnie) would no longer provide written documentation for Jackson's absences from Jernberg. (*Id.* ¶ 18.) Jackson seeks to prove this statement from his own affidavit, rather than by an affidavit from or testimony of Dr. Birnie.[6] Jackson then offers his statement to Jernberg, relaying Dr.

---

[6] There is no indication that a deposition was taken of either Jackson or Dr. Birnie.

Birnie's earlier alleged statement. (*Id.* ¶ 19.) Jernberg argues these statements are hearsay. Jackson responds that he offers the statement not for the truth of the matter asserted–that Dr. Birnie would not provide any more notes and, in the case of Jackson's statement to Jernberg, that Dr. Birnie made the statement in the first place–but for the effect that Dr. Birnie's statement had on Jackson. It is unclear how a specific statement, not attributable to Jernberg, is relevant to whether Jernberg discouraged its employees, or even Jackson specifically, from taking FMLA leave. Jackson has failed to demonstrate the relevance of these statements aside from their truth, for which they are inadmissible. The court will therefore not consider these statements in its analysis within.

Finally, Jackson offers several statements regarding the nature of his employment and a worker's compensation proceeding that coincided with his FMLA leave. The court has summarized Jackson's employment duties above, and his further attempted characterization of those duties is irrelevant. The worker's compensation proceeding is likewise irrelevant, and Jernberg's alleged conduct during that proceeding is inadmissible character evidence. Fed. R. Evid. 404(b).

**B.     FMLA**

The remaining issue is whether Jernberg's discipline and termination of Jackson violated the FMLA as a matter of law. Interpretation of the FMLA requires an evaluation of the "careful balance" the statute seeks between employees' medical needs and the "legitimate interests of employers." *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 94 (2002) (quoting 29 U.S.C. § 2601(b)(3)). Under the FMLA, eligible employees such as Jackson are entitled "to a total of 12 workweeks of leave during any 12-month period . . . (D) Because of a serious health condition that makes the employee unable to

perform the functions of the position of such employee."[7]  29 U.S.C. § 2612(a)(1). An eligible employee who takes FMLA leave because of a "serious health condition" may take that leave "intermittently," *see id.* § 2612(b)(1), meaning "taken in separate blocks of time due to a single qualifying reason." 29 C.F.R. § 825.202.

The employee's entitlement to this leave cannot be limited by the employer. Therefore, it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise" any FMLA right, including the taking of intermittent, medically necessary leave. 29 U.S.C. § 2615(a)(1). An employer's refusal to authorize leave and discouragement from taking leave both constitute impermissible interference. 29 C.F.R. § 825.220(b). The Seventh Circuit has stated the standard for interference claims:

> To prevail on an FMLA interference claim, an employee need only show that his employer deprived him of an FMLA entitlement; no finding of ill intent is required. Accordingly, the employee must establish that: (1) he was eligible for the FMLA's protections, (2) his employer was covered by the FMLA, (3) he was entitled to leave under the FMLA, (4) he provided sufficient notice of his intent to take leave, and (5) his employer denied him FMLA benefits to which he was entitled.

*Burnett v. LFW Inc.*, 472 F.3d 471, 477 (7th Cir. 2006) (internal citations omitted); *see also Jennings v. Ford Motor Co.*, No. 06 C 0877, 2008 WL 3853369, at *4 (S.D. Ind. Aug. 15, 2008) (finding that Seventh Circuit in *Burnett* did not adopt a more stringent definition of "interfere with" than that provided by regulation).

While an employer cannot interfere with its employee's leave, the "careful balance" described above protects the employer's legitimate interest in verifying that its

---

[7]  The parties have not addressed the discrepancy between the 88 days of leave that Jackson took between August 2005 and February 2006 and the 12 workweeks of leave required under the FMLA and Jernberg's attendance policy.

11

employee's leave is actually necessary. Therefore, an employee is required to explain why he needs FMLA leave, *see* 29 C.F.R. § 825.301(b), and may be required to support his explanation with a health care provider's certification. *See* 29 U.S.C. § 2613(a); *see also* 29 C.F.R. § 825.305. Protecting the employee against overzealous employers, though, the FMLA's regulations limit how often and with what notice an employer may demand certification. *See* 29 C.F.R. § 825.305(b) & (e).

Here, Jackson and Jernberg debate whether Jernberg denied Jackson "FMLA benefits to which he was entitled," *Burnett*, 472 F.3d at 477, by requiring a doctor's note for each instance of intermittent absence. Jernberg urges that its doctor's-note policy simply enabled it to verify that employees' claimed FMLA absences were indeed FMLA-related. For Jackson, the doctor's note policy was impermissible "interference" with his FMLA leave, and he specifically argues that the doctor's-note policy constitutes an impermissible recertification requirement.[8]

Other courts have considered whether a doctor's-note policy violates the FMLA.[9] In *Smith v. Calltech Communications, LLC*, No. 07 C 144, 2008 WL 4533667, at *5-*6 (S.D. Ohio Oct. 3, 2008), the court found that a doctor's-note policy did interfere with the

---

[8] After Jernberg terminated Jackson, the parties entered into arbitration, and a post-termination arbitrator's award found that Jernberg's enforcement of its doctor's-note policy against Jackson did not violate the FMLA. (*See generally* Def.'s Ex. 40.) Jernberg argues that this award is entitled to "great weight." The arbitrator did analyze whether Jernberg's policy as applied to Jackson violated the FMLA, but did not give the matter "full consideration," which is the premise underlying the rule affording deference to an arbitrator's decision. *See Darden v. Ill. Bell Tel. Co.*, 797 F.2d 497, 504 (7th Cir. 1986). The arbitrator fully analyzed the question of whether Jernberg had "just cause" to terminate Jackson, but did not address much of the case law discussed by the parties here, or the important factual distinction between this case and *Callison*, the one case upon which the arbitrator based her decision. (*See* Def.'s Ex. 40 D385-88.) The court therefore conducts an independent analysis of whether Jernberg interfered with Jackson's exercise of his rights under the FMLA.

[9] The parties debate whether "doctor's-note cases" are a subclass of FMLA-interference cases. This classification is unsupported by case law, but also unimportant; what is important is that other courts have addressed cases in which an employee asserted that his employer's doctor's-note policy interfered with his FMLA rights.

12

employee's FMLA rights because the policy imposed an impermissible recertification. The *Smith* court noted that it would "assume" that the regulations governing recertification described above applied to the employer's doctor's-note policy. *Id.*, 2008 WL 4533667, at *4-*5. In *Gibson v. Lafayette Manor, Inc.*, No. 05 C 1082, 2007 WL 951473, at *17-*18 (W.D. Pa. Mar. 27, 2007), the court considered the same question but found the record insufficient to determine whether the policy was an impermissible recertification requirement as a matter of law. *Id.*, 2007 WL 951473, at *17 (citing 29 C.F.R. § 825.308).

In *McClain v. Detroit Entertainment, L.L.C.*, 458 F. Supp. 2d 427, 434-35 (E.D. Mich. 2006), the employer requested "an additional certification" from its employee. The court noted that the "additional certification" might be impermissible recertification or might be less than that, "some sort of assurance" that absences were FMLA-related, a situation which "the FMLA and its implementing regulations do not address." *Id.* at 436. Finally, in *Gonzalez-Rodriguez v. Potter*, 605 F. Supp. 2d 349, 370-71 (D.P.R. 2009), a court denied summary judgment to an employer on a former employee's FMLA-interference claim, and stated that a doctor's-note policy might violate the FMLA, but did not specifically analyze the regulatory definition of interference set out above, or the recertification provisions.[10]

While these cases each cast some doubt on the use of doctor's-note policies generally, no case specifically holds both that the recertification regulations govern

---

[10] In *Miller v. Winco Holdings, Inc.*, No. 04 C 476, 2007 WL 1471263, at *1, *12 (D. Idaho May 22, 2006), the plaintiff failed to produce sufficient evidence to substantiate her claim that the defendant employer's attendance policy (which included a doctor's-note requirement) violated the FMLA, and so the court granted summary judgment to the defendant; the court explicitly decided the case on evidentiary grounds, and did not evaluate whether a doctor's-note policy is *per se* permissible as a matter of law under the FMLA. The parties have not cited any cases within the Seventh Circuit or by any appellate court evaluating the sort of doctor's-note policy at issue here, and the court has found none.

13

doctor's-note policies *and* that a doctor's-note policy imposes an impermissible recertification requirement, and no case otherwise explains how a doctor's-note policy interferes with an employee's FMLA leave. The *Smith* court persuasively found that a doctor's-note policy violates the recertification regulations to the extent that those regulations cover such a policy but never analyzed whether the recertification regulations apply in the first place, instead noting that it assumed as much. 2008 WL 43533667, at *5. The *McClain* court appeared to make the same assumption. 458 F. Supp. at 436-37.

Jernberg contests this assumption. According to Jernberg, recertification and the doctor's-note policy serve different purposes: the purpose of recertification is to ascertain the continued existence of an FMLA-qualifying medical condition, while the doctor's-note policy simply verifies that an employee's *particular* absence is related to his already-certified FMLA-qualifying condition. Because recertification and a doctor's note are not required for the same purpose, Jernberg argues, the regulations governing the former do not govern the latter.

Jernberg is correct. The FMLA allows employers to verify that its employees' FMLA-related absences are validly claimed as such, and Jernberg has chosen its doctor's-note policy as its means of verification. In providing a doctor's note, Jackson did not need to provide medical certification that his wrist and hand problems continued generally, just that his condition prevented him from working on the days on which he was absent. During his period of FMLA-certified intermittent leave, Jackson could have been absent for any number of non-wrist-related reasons, and indeed was: after his return from surgery, Jackson was tardy two days and absent for thirteen days for reasons unrelated to his wrist. Jernberg's doctor's-note policy was intended to verify that

14

Jackson's absences were FMLA-related, and not that his FMLA-certified condition persisted.

However, from this conclusion it does not necessarily follow that Jernberg's doctor's-note policy was permissible under the FMLA and its regulations, which make clear that employers cannot interfere with or discourage the exercise of FMLA rights in any way, not just by demanding recertification. In determining the proper balance, courts have found that a number of employer verification requirements are permissible under the FMLA. An employer may require that an employee call in to verify that his absence is FMLA-related, *see Callison v. City of Phila.*, 430 F.3d 117, 121 (3d Cir. 2005); *see also Lewis v. Holsum of Fort Wayne, Inc.*, 278 F.3d 706, 710 (7th Cir. 2002); may call the employee at home as means of verification, *Callison*, 430 F.3d at 121; and may require that an employee submit a written personal certification attesting that an individual instance of leave was FMLA-related. *See Sconfienza v. Verizon Pa., Inc.*, No. 05 C 272, 2007 WL 1202976, at *34 (M.D. Pa. Apr. 23, 2007), *aff'd* 307 Fed. Appx. 619 (3d Cir. 2008).[11] Each of these holdings is consistent with the Seventh Circuit's observation that "Nothing in the FMLA or the implementing regulations prevents an employer from enforcing a rule requiring employees on FMLA leave to keep the employer informed

---

[11] In an opinion released since Jackson and Jernberg briefed their motions, the Sixth Circuit reversed partial summary judgment entered against an employer on its employee's FMLA-interference claim. *See Allen v. Butler Cty. Comm'rs*, 331 Fed. Appx. 389 (6th Cir. 2009). In *Allen*, the sick leave policy agreed to in the relevant collective bargaining agreement required that employees not yet on FMLA-certified leave either call in each day of their absence or bring a doctor's note. *Id. Allen* is distinguishable; here, Jernberg's policy imposed requirements even after certification, and did not offer Jackson the alternative of a daily call-in.

Likewise inapposite is a Department of Labor opinion letter cited by the parties in which an employer required a doctor's note for employees to be paid for their sick leave; in the situation addressed by the Department of Labor, the doctor's note was not a means by which the employer verified that an employee's absences were related to the employee's FMLA-certified condition. Dept. of Labor, FMLA2004-3-A (Oct. 4, 2004).

about the employee's plans." *Gilliam v. United Parcel Serv., Inc.*, 233 F.3d 969, 972 (7th Cir. 2000).

Jernberg's doctor's-note policy differs from those described above because it requires action not just by the FMLA-certified employee, but by the employee's doctor. Jackson maintains that the requirement of third-party approval is onerous, and pushes Jernberg's policy past the line separating permissible verifications and impermissible interference. According to Jackson, the prospect of obtaining third-party verification–particularly in cases of intermittent leave, in which instances of absences, and, in turn, necessary verifications, may be numerous–discourages Jernberg employees from taking FMLA leave.

Jackson rightly argues that Jernberg's doctor's-note policy interfered with his exercise of FMLA leave. The FMLA explicitly provides for the way in which Jernberg can seek information from its employees' doctors regarding employee FMLA leave in the aforementioned recertification provisions. The statute and its regulations do not explicitly address a doctor's-note policy, *see McClain*, 458 F. Supp. at 436, but do show an intent to limit medical verification to certification and recertification as delineated. Neither the FMLA nor its regulations provide for any other means by which an employer can require documentation from an employee's medical provider. Recertification is generally allowed "only in connection with an absence by the employee," suggesting that recertification, not some other doctor-provided verification, is the proper means by which an employer can assure itself that the employee's absence is connected to his FMLA-certified condition. 29 C.F.R. § 825.308(a); *see also* § 825.308(b) (allowing recertification after leaves of various lengths "in connection with an absence by the

employee"). Moreover, the regulations allow an employer that doubts whether its employee's absence is actually related to his FMLA-certified condition to request recertification; these regulations protect an employer in doubt but do not provide for any other form of medical verifications. *Id.* § 825.308(c)(3); *see also id.* § 825.307(b) (allowing employer to demand that employee seek a second opinion regarding original certification when it "has reason to doubt the validity of a medical certification"). Finally, the regulations limit the situations after certification in which employers can request information from health care providers, stating, "If an employee submits a complete and sufficient certification signed by the health care provider, the employer may not request additional information from the health care provider. . . . Employers may not ask health care providers for additional information beyond that required by the certification form." 29 C.F.R. § 825.307(a). Had Congress, or the Department of Labor, desired to permit employers to demand such intermittent verifications, the statute or regulations would provide as much. Instead, the regulations provide that an employer can verify the absence-condition connection by means of recertification.

Jernberg's doctor's-note policy likewise constitutes interference on a practical level. Depending on how absences fall, employees with FMLA-certified conditions may be required to obtain a doctor's note more than once weekly, despite the company's acknowledgment of the employee's condition. Jernberg demanded that Jackson provide a doctor's note for each of his instance of absences; Jackson provided five doctor's notes in the twelve-month period at issue, and Jernberg would have had him return a half-dozen more times for his FMLA-certified absences. Jernberg argues that Jackson's ability to procure these five notes indicates that its doctor's-note policy does not discourage FMLA

17

leave. Under this logic, though, any employer's policy could be justified under the FMLA if an employee, not wanting to be fired, *could* comply with it. The question is not whether an employee can comply with the policy, but whether the employer's enforcement of its policy discourages the employee from exercising his FMLA leave. Here, by requiring that Jackson seek out a doctor's note for each of his absences, Jernberg's doctor's-note policy discouraged Jackson from taking his FMLA-certified leave.

As a defense of its use of a doctor's-note policy, Jernberg cites to cases delineating the steps an employer can take once it has an "honest suspicion" that an employee is abusing FMLA leave. *See, e.g.*, *Vail v. Raybestos Prods. Co.*, 533 F.3d 904, 909 (7th Cir. 2008). Of course, an employer can defeat an FMLA-interference claim by showing that the employee took leave other than for the FMLA-certified purpose, and may have greater latitude in making such a showing once it has the requisite "honest suspicion." *Id.* But the undisputed facts do not suggest that Jernberg had any suspicion that Jackson was abusing his FMLA leave, just that he did not cooperate with its attempts, pursuant to its doctor's-note policy, to verify that his absences were related to his FMLA-certified condition.

In *Vail*, the employer noticed that its employee's pattern of purportedly FMLA-related absences were suspicious; a private investigator's report confirming that the employee may have been abusing her leave was then sufficient to give the employer the requisite "honest suspicion." 533 F.3d at 909-10. Likewise, in *Crouch v. Whirlpool Corp.*, 447 F.3d 984, 986 (7th Cir. 2006), the Seventh Circuit noted that the employer at issue in that case had an "honest suspicion" of FMLA abuse stemming from evidence of

18

the employee's "coinciding dates of [the employee's] vacation and disability leave requests and from the identical reasons he gave for the two disability leaves." If Jernberg had similar evidence, it might justifiably require recertification pursuant to the provisions described above, or might deny claimed leave without greater documentation. Instead, Jernberg offers several absences that Jackson supported by documentation, all of which Jackson admitted were unrelated to his FMLA-certified condition. If Jackson were abusing his FMLA-certified condition, why would he produce non-FMLA reasons, supported by medical documentation, for his non-FMLA absences? While it is unclear whether Jernberg is asserting in its briefs that it had an honest suspicion that Jackson was abusing his leave, what is clear is that Jernberg has produced insufficient evidence that it actually had such a suspicion.

## IV. CONCLUSION

For the reasons stated above, Jernberg's motion for summary judgment is denied, and Jackson's motion for summary judgment is granted.

ENTER:

/s/
JOAN B. GOTTSCHALL
United States District Judge

DATED: January 6, 2010